# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WASHINGTON, D.C.

| | |
|---|---|
| **ROBERT M. MILLER,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **JELENA MCWILLIAMS, CHAIRWOMAN;** | ) |
| **FEDERAL DEPOSIT INSURANCE** | ) |
| **CORPORATION,** | ) |
| **Defendants.** | ) |
| | ) |

Case: 1:21−cv−03035
Assigned To : Nichols, Carl J.
Assign. Date : 12/3/2021
Description: Pro Se Gen. Civ. (F−DECK)

**VERIFIED COMPLAINT AND PETITION FOR REVIEW**

**JURY TRIAL WAIVED**

## VERIFIED COMPLAINT AND PETITION FOR REVIEW

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

RECEIVED

DEC − 3 2021

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WASHINGTON, D.C.

|  |  |
|---|---|
| **ROBERT M. MILLER,** | Case: 1:21−cv−03035 |
| **Plaintiff,** | Assigned To : Nichols, Carl J. |
| **v.** | Assign. Date : 12/3/2021 |
|  | Description: Pro Se Gen. Civ. (F−DECK) |
| **JELENA MCWILLIAMS, CHAIRWOMAN;** | **VERIFIED COMPLAINT AND** |
| **FEDERAL DEPOSIT INSURANCE** | **PETITION FOR REVIEW** |
| **CORPORATION,** |  |
| **Defendants.** | **JURY TRIAL WAIVED** |

## VERIFIED COMPLAINT AND PETITION FOR REVIEW

**COMES NOW**, Plaintiff Robert M. Miller, *pro se*, pursuant to Federal Rules of Civil Procedure (F.R.C.P.), and for his claims against Defendants, alleging as follows.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction for this civil action under 28 U.S.C. §1331.

2.      Plaintiff's discrimination, retaliation, and hostile work environment claims on the bases of race and sex are brought pursuant to Title VII of Civil Rights Act of 1964 as amended ("Title VII"), codified in 42 U.S.C. §2000e et seq. Disability discrimination and retaliation claims are brought under the Americans with Disabilities Act (ADA) and/or the Rehabilitation Act (RA), codified in 29 U.S.C. §791; 42 U.S.C. §12112, 42 U.S.C. §12203.

3.      Claims of retaliation for opposing discriminatory acts or practices are brought under 42 U.S.C. §2000e-3, 29 U.S.C. §623, and 42 U.S.C. §12203.

4.      Judicial review of MSPB case number DC-1221-20-0720-W-1, for whistleblower reprisal is brought pursuant to the Whistleblower Protection Act, Pub.L. 101-12, Whistleblower Protection Enhancement Act, Pub.L. 112-199, as amended, and codified in 5 U.S.C. §2302(b)(8)-(9), 5 U.S.C. §7702-7703, and 29 C.F.R. §1614.310(a).

5.    Judicial review of MSPB case number DC-0752-20-0790-I-1 for an adverse action appealable to the Board is brought pursuant to 5 U.S.C. §75, 5 U.S.C. §7702-7703, and 29 C.F.R. §1614.310(a).

6.    Declaratory judgment and relief are authorized under 28 U.S Code § 2201-2202.

7.    The Court has inherent powers of injunctive relief under U.S. Const., Art. III, Sec. 2.

8.    Venue is proper under 29 U.S.C. §1391(b)(1) and (e)(1) as a substantial part of the events giving rise to the claims occurred in Washington, D.C., and all Defendants and Plaintiff reside in or near Washington, D.C.

9.    All conditions precedent have been satisfied. Plaintiff received a Final Decision from the Merit Systems Protection Board on November 4, 2021 for his discrimination, whistleblower reprisal claims, and Chapter 75 appeal. Exh. 28. This Complaint and Petition for Review are timely filed.

## PARTIES

10.    At all times relevant to these claims, Plaintiff was employed by the Federal Deposit Insurance Corporation (FDIC) as a Senior Financial Economist, CG-0110-14, at FDIC Headquarters in Washington, D.C.

11.    Defendant Jelena McWilliams is Chairwoman of the FDIC.

12.    Defendant FDIC is a federal government corporation as defined in 31 U.S.C. §9101. Congress waived sovereign immunity for the FDIC in its charter, 12 U.S.C. § 1819(a), and for specific claims through relevant statutes.

## STATEMENT OF FACTS

**Facts Related to Discrimination and Retaliation for Disclosures Protected by Title VII, ADA, and WPEA.**

13.     Plaintiff is a white male.

14.     At all times relevant to this complaint, Plaintiff was permanently disabled with a history of prostate cancer and major depressive disorder, spinal stenosis, and other disabilities.

15.     Plaintiff was born in 1965 and was 54 to 55 years old at the time of the events in question.

16.     From 2011 to the present, Plaintiff filed numerous prior discrimination and retaliation complaints against Defendants under Title VII, ADA, and WPEA.

17.     Defendants knew Plaintiff's protected classes during all events in this case.

18.     From 2012 through 2020, Plaintiff made at least twenty-one whistleblower disclosures to the FDIC Office of the Inspector General (OIG) and/or FDIC management. Exh. 2; Exh.14, p.9.

19.     Of all Plaintiff's whistleblower disclosures, OIG and management responded only three times and completely ignored the rest. In the three responses, OIG and management failed to take allegations seriously and took no action to further investigate the disclosures even though Plaintiff provided supporting evidence.

20.     Shortly before November 13, 2019, Plaintiff contacted Senator Ron Johnson,  then-Chairman of the Senate Homeland Security and Governmental Affairs Committee, through his whistleblower hotline. A member of Senator Johnson's staff emailed Plaintiff in response.

21.     Plaintiff contacted Senator Mike Crapo, then-Chairman of the Senate Committee on Finance that oversees FDIC. Crapo's staff advised Plaintiff to make another whistleblower disclosure to the agency.

22.     November 13, 2019, Plaintiff emailed thirty-nine paragraphs of protected disclosures to Chairwoman McWilliams, General Counsel Nicholas Podsiadly, and Inspector General Jay Lerner. ("*Nov. 13 Disclosures*") Exh. 1.

23.     *Nov. 13 Disclosures* made specific and detailed allegations of false statements (18 U.S.C. §1001), false signings (F.R.C.P. 11), perjury (18 U.S.C. §1621 or equivalent), misprision of felonies (18 U.S.C. §4), unfair grievances (5 U.S.C. §7121), abuses of authority (wrongdoers exonerating themselves and making false statements in a grievance), and Constitutional torts.

24.     *Nov. 13 Disclosures* alleged FDIC "makes no attempt whatsoever to actually investigate discrimination; it merely goes through the motions of investigation and never gathers enough information to reach a final decision."

25.     *Nov. 13 Disclosures* alleged a disproportionate number of women and minorities compared to their share of population had violated law against Plaintiff since 2011.

26.     *Nov. 13 Disclosures* had a table of names and demographic characteristics of alleged wrongdoers.

27.     August 5, 2019; November 14, 2019; and November 15, 2019, Plaintiff sent emails from his work email address to his personal email address, attaching an Excel spreadsheet named "Perps.xlsx." Exh. 3.

28.     According to Defendants, the spreadsheet Perps.xls "include[d] data of FDIC individuals involved in [Plaintiff's] personal disputes, along with notations about [Plaintiff's] perceptions of the race, sex, sexual orientation, political party, and other demographic data related to these individuals."

29.     Perps.xlsx contained statistical calculations of the share of alleged wrongdoers in each demographic class. *Id.*

4

30.     November 14, 2020, Plaintiff made whistleblower disclosures to the Council of Inspectors General for Integrity and Efficiency (CIGIE) alleging IG ignored disclosures of felony crimes and other wrongdoing. Exh. 11. (*Nov. 14 Disclosures*).

31.     Plaintiff also sent his *Nov. 14 Disclosures* to McWilliams, Podsiadly, and a staff member of U.S. Senator Ron Johnson. *Id.*

32.     November 15, 2019, Podsiadly wrote to Assistant General Counsel Jeff Rosenblum and Chief of Staff Brandon Milhorn about *Nov. 14 Disclosures*, "Jeff, Do you have time to discuss this email with Brandon and I this afternoon?" *Id.*

33.     August 4, 2020, Milhorn forwarded *Nov. 14 Disclosures* to agency lawyers Aaron Wade ("Wade") Norman and Thomas Sarisky. *Id.*

34.     December 2, 2019, OIG acknowledged receipt of *Nov. 13 Disclosures*, stating, "Your allegations are currently under review by our office." Exh. 1.

35.     On or about December 5, 2019, Norman created a spreadsheet containing Plaintiff's workplace internet browsing history, later used as a basis for personnel actions. Exh. 4.

36.     Defendants had no legitimate business purpose for the search of Plaintiff's internet browsing history on or about December 5, 2019.

37.     Upon returning to the office from leave on or about January 8, 2020, Plaintiff found no emails from FDIC or OIG regarding *Nov. 13 Disclosures*, now almost two months old.

38.     On or about January 8, 2020, Appellant contacted Senator Crapo's office again, and his staff advised Plaintiff to make another whistleblower disclosure.

39.     January 9, 2020, Appellant emailed protected disclosures to McWilliams, General Counsel Nicholas Podsiadly, a staff member for U.S. Senator Ron Johnson, Wall Street Journal reporter Bart Ziegler, Inspector General Jay Lerner, and CIGIE. ("*Jan. 9 Disclosures*"). Exh. 1.

40.     *Jan. 9 Disclosures* reiterated, updated, and made new protected disclosures of discrimination and violations of law, rule, or regulation.

41.     *Jan. 9 Disclosures* alleged "FDIC **never** does a thorough [EEO] investigation and does not actually want to find evidence of discrimination or retaliation." Plaintiff specifically alleged EEO investigators did not ask responsible management officials (RMOs) in retaliation claims whether they had prior knowledge of Plaintiff's protected disclosures. Plaintiff alleged Deputy Director Andrea Woolford-Eley refused to answer an investigator question.

42.     *Jan. 9 Disclosures* alleged "FDIC **never** grants relief in a [Final Agency Decision]. The FDIC's FY 2018 Annual Federal EEO Statistical Report of Discrimination Complaints, page 20, shows a grand total of **ZERO** FADs finding discrimination out of 10 complaints. In FY 2017, the FDIC found discrimination in **ZERO** FADs out of 19 complaints."

43.     From 2010 through 2019 (excluding 2015), Defendants issued 147 FADs without a decision from an EEOC administrative judge, and they found themselves liable for only one complaint – a *per se* violation of the Rehabilitation Act.[1]

44.     *Jan. 9 Disclosures* alleged "The FDIC has rigged its 'investigation' process to smoke out complainant claims, to gain time to develop false and pretextual responses, and to delay adjudication as long as possible. It knows or believes that many of these cases will be dismissed, settled, or wither on the vine. This is **NOT** what our FDIC EEO Policy promises."

45.     *Jan. 9 Disclosures* alleged Agency Counsel Eric Gold wrongfully attempted to settle Plaintiff's successful EEO complaint in FDICEO-14-030 so Defendants could "avoid a finding of

---

[1] FDIC apparently never filed its 2015 EEOC Form 462 to the EEOC.

guilt and not have to punish any of the **six** FDIC employees who discriminated and retaliated against me."

46.      OIG Report No. EVAL-15-001 states, "[Office of Women and Minority Inclusion] officials [assured us] that the FDIC was not routinely settling EEO cases to avoid findings of discrimination." Exh. 5.

47.      *Jan. 9 Disclosures* alleged Defendants, by and through attorney Patricia Davison Lewis, filed a frivolous appeal of FDICEO-14-030 which included perjury by an Agency witness that Defendants knew was perjury at the time, for the improper purpose of delaying Plaintiff's relief.

48.      *Jan. 9 Disclosures* accused Defendants of failing in their oaths to "support and defend the Constitution of the United States from all enemies, foreign and domestic." This phrase comes directly from the Oath of Office in 5 U.S.C. §3331.

49.      *Jan. 9 Disclosures* used boldface type on innocuous words.

50.      *Jan. 9 Disclosures* closed with the phrase, "This will not end well."

51.      The phrase "This will not end well" is derived from the Book of Ecclesiastes, Chapter 8, verses 11-13 in the Bible. This phrase has been used for centuries in sermons and in common usage without any connotation of violence.

52.      Some of Plaintiff's prior whistleblower disclosures also had boldface type, but these uses did not arouse "alarm" in Defendants. Exh. 2.

53.      Plaintiff reasonably believed *Nov. 13, Nov. 14,* and *Jan. 9 Disclosures* evinced discrimination; retaliation; violations of law, rule, or regulation; abuses of authority; and gross mismanagement.

54.      *Nov. 13 Disclosures and/or Jan 9. Disclosures* (jointly, "*Disclosures*") specifically named as wrongdoers, *inter alia*: McWilliams, Podsiadly, Milhorn, Rosenblum, and Woolford-Eley.

55.     *Disclosures* specifically identified several FDIC attorneys committing misconduct in Plaintiff's various complaints, such as making false signings, refusing to produce discovery in good faith, suborning witness perjury, knowingly relying on witness perjury, and making frivolous appeals. These attorneys included: Thomas Sarisky, Eric Gold, Judith Thomsen, and Patricia Davison Lewis.

56.     In MSPB whistleblower retaliation case DC-1221-18-0070-W-1, Gold relied on a declaration from Agency Counsel Christine Svevar to move for an enlargement of time for Agency's untimely response, to serve discovery, and to respond to Plaintiff's jurisdictional statement.

57.     Upon information and belief, Svevar committed perjury in the declaration saying, "Although the Order's certificate of service indicates that I was served with a copy of the Order via electronic mail, I did not receive it." This violates 28 U.S.C. §1746

58.     Podsiadly and Rosenblum supervised attorneys Sarisky, Gold, Thomsen, Lewis, and Svevar.

**Facts relating to discriminatory and retaliatory personnel actions.**

59.     January 9, 2020 at 5:07 p.m., Podsiadly forwarded *Disclosures* to Rosenblum saying, "Jeff, Please see below. We should discuss. Thanks. Nick."

60.     January 9, 2020 at 6:01 p.m., Rosenblum forwarded *Disclosures* to attorneys William S. ("Bill") Jones, Gold, Sarisky, Svevar, and Norman.

61.     January 10, 2020 at 9:39 a.m., Rosenblum emailed *Disclosures* to Woolford-Eley, with no accompanying text.

62.     January 10, 2020, Woolford-Eley met with Philip Shively, Director of the Center for Financial Research and Plaintiff's second-level manager, to discuss *Disclosures*.

63.     Woolford-Eley testified she was alarmed by *Disclosures* because they were "pointed and direct."

64.     Shively testified he was alarmed by *Disclosures* because they evinced "a level of frustration."

65.     January 10, 2020 at about 2:30 p.m., Defendants conducted an investigatory interview of Plaintiff based on the contents of *Disclosures*.

66.     Adam Bovenzi was a Labor and Employee Relations Specialist. Bovenzi reported directly to Gold.

67.     At this time, Gold was Acting Director of the Labor and Employee Relations Section (LERS) – a management official, not legal counsel.

68.     Daryl John (D.J.) Miller worked for FDIC Security.

69.     Plaintiff's first-level supervisor was Ryan Singer; Chief, Regulatory Analysis Section.

70.     About ten minutes before the interview, Singer handed Plaintiff the questions Defendants were going to ask. Shortly thereafter, Singer said, "I guess I wasn't supposed to give those to you," or words to that effect. One question was whether Plaintiff had thoughts of harming others.

71.     Bovenzi and D.J. Miller conducted the interview at approximately 2:30 p.m.

72.     Bovenzi asked Plaintiff a series of questions, and Plaintiff provided responses. Exh. 6.[2]

73.     When Bovenzi was about to ask whether Plaintiff had thoughts of harming others, he was hesitant and squirmed in his chair. Plaintiff chuckled at Bovenzi's discomfort, already knowing the question Bovenzi was about to ask.

---

[2] Plaintiff does not concede Bovenzi and D.J. Miller's notes correctly and completely captured what they asked or how Plaintiff responded. Plaintiff's complaint will rely on their notes as statements-against-interest, and dispute those notes when specified.

74.    After the interview, Plaintiff was not guarded by special police, and he exited the building without escort more than an hour after the interview concluded.

75.    D.J. Miller admitted that nothing on January 10, 2020 prevented Plaintiff from harming the Chairman or other persons after the investigatory interview.

76.    Bovenzi and D.J. Miller admitted they perceived no threatening demeanor based on their first-hand observations of Plaintiff in the investigatory interview.

77.    Singer consulted with Shively about putting Plaintiff on administrative leave.

78.    January 11, 2020, Singer put Plaintiff on one week of paid administrative leave, becoming indefinite on January 17, and remaining in place until Plaintiff was suspended on August 5, 2020.

79.    Singer requested Plaintiff not enter FDIC facilities or log into the FDIC network.

80.    Woolford-Eley, Norman, Rosenblum, Sarisky, Gold, and Svevar advised or assisted Singer, Shively, and Deciding Official Patrick Mitchell in management actions against Plaintiff.

81.    Podsiadly, Rosenblum, Woolford-Eley and Gold admitted other persons in FDIC could have performed their duties in the personnel actions in their absence.

82.    Podsiadly, Rosenblum, Woolford-Eley, Gold, Sarisky did not recuse themselves even though they were named as wrongdoers in *Disclosures*.

83.    January 20, 2020, Plaintiff sent Podsiadly a seventeen-paragraph email alleging whistleblower retaliation. This email contained a coarse comment in the last sentence. Exh. 7.

84.    January 24, 2020, Shively offered Plaintiff, under threat of discipline, to attend a psychiatric examination from one of three agency-designated doctors. Exh. 8. Shively included links to the doctors' professional websites. Shively reiterated the demand on February 6, 2020. *Id.*

85.    The agency-designated doctors were Eliza Gold, Ryan Shugarman, and Gazala Ansari.

86.     Plaintiff determined from public sources of information that Eliza Gold is female, Jewish, and Democrat; Ryan Shugarman is male, Jewish, and Democrat; and Gazala Ansari is female, Muslim, and Democrat. Eliza Gold is a gun control advocate.

87.     The Court may take judicial notice that Jews and Muslims are approximately 2% of the U.S. population, each.

88.     Plaintiff believed that the ethnic demographics of the doctors were so rare, that they likely did not come from a diverse selection pool representative of the population.

89.     Norman selected Shugarman. Bovenzi contacted Ansari.

90.     Shively's letter allowed Plaintiff to submit a report from his own doctor to be considered *in addition* to the agency doctor report.

91.     Shively's correspondence from January 29 through March 9, 2020 asserted management was concerned by "recent events" it believed indicated Plaintiff was "unstable" and could pose a threat to himself or others.

92.     Plaintiff requested Shively tell him what "recent events" Shively was investigating. Exh. 9. Shively never responded before proposing suspension.

93.     Plaintiff objected to the three doctors believing they would be prejudiced by Plaintiff's disclosures of wrongdoing by women, minorities, and Democrats.

94.     Plaintiff requested Shively voluntarily stay personnel actions until the Office of the Special Counsel (OSC) decided whether to request a stay. Shively never replied about this.

95.     February 4, 2020, Shively emailed Plaintiff a warning about his comment to Podsiadly, and ordered Plaintiff to return his workplace laptop computer. Exh. 10.

96.     Shively accused Plaintiff of "expressing unacceptable discriminatory animus" for objecting to these doctors and "your request that you only be examined by a 'white, male,

11

Christian, heterosexual, Republican' doctor). *Id.* Shively alleged Plaintiff made "broad assertions that groups of people are inherently untrustworthy merely because they belong to a certain race, gender, religion, sexual orientation, or political party. The FDIC **will not** honor requests by employees to limit their interactions with others based upon their demographic characteristics, and the agency views such requests as inherently discriminatory." *Id.*

97.     Plaintiff never made any broad assertions that people are inherently untrustworthy because of their demographic classes. Plaintiff never requested to "limit his interactions with others" based upon their demographic characteristics.

98.     Plaintiff returned his work laptop to an FDIC courier on February 5, 2020.

99.     On or about February 5, 2020, Defendants conducted a forensic search of Plaintiff's internet browsing history and laptop computer.

100.    FDIC had no legitimate business purpose for conducting these computer searches on or about February 5, 2020.

101.    Defendants identified two instances of Plaintiff seeking *directions* to a store that sells guns (among many other things), and one instance of *reading* a news article about a legal case involving 'bump stocks," which increase the rate of fire on semiautomatic rifles. Exh. 12.

102.    March 9, 2020, Shively proposed to indefinitely suspend Plaintiff without pay ("*Proposal*") Exh. 13.

103.    *Proposal* relied, in part, on Plaintiff sending "a follow-up email to the FDIC's OIG Hotline, copying the FDIC's Chairman, General Counsel, and various other outside entities, complaining that OIG had failed to investigated various allegations you have made against FDIC officials." *Id.*

12

104.    *Proposal* relied, in part, on Plaintiff alleging that a disproportionate number of Democrats, Jewish people, Blacks, women, and women or minorities were "involved in violating my rights and committing crimes and abuses." *Id.*, p. 2.

105.    *Proposal* relied, in part, on Plaintiff alleging a "conspiracy of left-wing women and minorities against white males and Republicans." *Id.*

106.    *Proposal* relied, in part, on Plaintiff saying, "The FDIC is a racist, sexist, and criminal organization. As a retired veteran with 21 years of service, I swore an oath to support and defend the Constitution of the United States against all enemies, foreign and domestic. You took that same oath, but you are not fulfilling that oath. You are enemies of our Constitution. This will not end well." *Id.*

107.    *Proposal* did not charge Plaintiff for making a threat.

108.    *Proposal* relied, in part, on Plaintiff purportedly laughing or chuckling after Bovenzi asked him, "Have you thought about harming any of the people you mention in your emails?," and responding "Thought? [Haha] Would I? No. Absolutely not. I go to the VA hospital. The Doctor always asks, "have you thought about harming yourself or others" and the answer to both is always no. It's not who I am. If I was inclined to violence, I would have done so years ago." *Id.*, p. 3.

109.    *Proposal* relied, in part, on Plaintiff telling Podsiadly, "Start treating me like a victim and start treating the others as criminals, or you will share a cell with them in a federal pound-you-in-the-ass penitentiary." *Id.*, p. 3.

110.    *Proposal* did not charge Plaintiff with disrespect for profanity toward Podsiadly.

111.    *Proposal* relied, in part, on Plaintiff "not concur[ring] with the short list of psychiatrists you have provided" because his whistleblower disclosures specifically alleged a disproportionate number of minorities and women committed unlawful acts against Plaintiff. *Id.*, p. 4.

112.    *Proposal* relied, in part, on a "forensic search" discovering that on August 5, 2019, November 14, 2019, and November 15, 2019, Plaintiff sent an email from his FDIC work address to his personal email address an Excel document with the file name 'Perps.xlsx.' *Id.*, p. 5.

113.    The file 'Perps.xlsx' included "data on FDIC individuals involved in your personal disputes, along with notations about your perceptions of the race, sex, sexual orientation, political party, and other demographic data related to these individuals." *Id.*

114.    Shively admitted that "perps" is an abbreviation of "perpetrators," and that "perpetrators" are people who commit crimes.

115.    *Proposal* relied, in part, on Plaintiff using the FDIC's computer network, on September 26 and November 6, 2019, to access the Google Maps entry for Proven Arms and Outfitters in Woodbridge, VA, a store that sells guns among many other things. *Id.*

116.    On and around those dates, Proven Arms and Outfitters was having a going-out-of-business sale.

117.    *Proposal* relied, in part, on Plaintiff using FDIC's computer network on December 12, 2019 to "access news stories about a court case involving the legality of 'bump stocks,' which the U.S. government took action to make illegal after the 2017 Las Vegas mass shooting incident." *Id.*

118.    Plaintiff had submitted a public comment opposing BATFE's bump stock rule, and he informally advised lead counsel in *Guedes v. BATFE*, 18-cv-2988 (D.D.C.) – the bump stock case the news story was about. Plaintiff's comment on the rule attacked its deficient cost-benefit analysis.

119.    Plaintiff had proposed to Singer to present the cost-benefit analysis of the BATFE bump stock rule to his work group for discussion.

120.    *Proposal* never explained how any of the supporting factual allegations indicated Plaintiff was "unstable" and "posed a threat to himself or others."

121.    Penalty in the *Proposal* stated Shively "considered, among other things as set forth above and below, the relevant factors set forth in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). *Id.*, p. 6.

122.    *Proposal* did not mention or discuss any of the individual *Douglas* factors. *Id.*

123.    *Proposal* did not state specifically what other penalties Shively considered or why those were inappropriate. *Id.*

124.    Penalty in the *Proposal* relied, in part, on "You also stated that doctors from the Veterans' Administration have repeatedly asked you about whether you have an intent to harm yourself or others." *Id.*, p. 6.

125.    Plaintiff's *Response* to the *Proposal* said, "the VA *routinely* asks these questions of *all* patients at every visit." Exh. 14, p. 22.

126.    April 8, 2021, Plaintiff's psychiatrist stated "Suicidal and homicidal ideations are routinely assessed for all patients in VA and especially mental health patients. This is a part of the routine assessment." Exh. 26.

127.    Penalty in *Proposal* relied, in part, on Plaintiff "seeing a doctor, that you are 'not OK,' that you are under extreme stress that has made you unable to sleep, and that you are not taking care of yourself." Exh. 13, p. 6.

128.    Penalty in *Proposal* relied, in part, on "demonstrating some degree of interest in weapons that have been utilized in recent mass shootings in the United States." *Id.*, p. 6.

129.    Penalty in *Proposal* relied, in part, on "While you claim you have no intent to harm others, when asked specifically about whether you would harm others, you laughed and admitted that you have thought about it, but claimed that you would never follow through." *Id.*

130.    Plaintiff never admitted he thought about harming others, and he expressly denied it. *Id.*, p.3.

131.    March 25, 2020, Plaintiff submitted a written *Response* to Deciding Official Mitchell, and verbally in a video teleconference. Exh. 14. Mitchell asked no questions about Plaintiff's responses.

132.    *Response* rebutted every allegation with legitimate, plausible, and non-violent explanations.

133.    April 10, 2020 at 3:48 p.m., Deciding Official Patrick Mitchell emailed Plaintiff providing "additional flexibility in choosing a health professional." Mitchell's attached letter stated, "Although you are free to be examined by any of these [three agency-designated doctors], you also have the flexibility to provide documentation from a private practitioner or health professional of your choosing." Exh. 15.

134.    Mitchell's *Decision* wrote, "On April 10, 2020, I wrote to give you more time to provide medical documentation, and reminded you that you could provide your own doctor's information **rather than** being examined by one of the FDIC's suggested providers." [emphasis added] Exh. 23.

135.    April 10, 2020 at 4:04 p.m., Mitchell stated, "It is up to you whether you submit medical information, and what information you include." Exh. 16.

136.    May 18, 2020, Plaintiff's psychiatrist from the Washington, D.C. Veterans Administration (VA) Medical Center, Dr. Saima Warraich, provided a letter to Plaintiff. Exh. 17. ("*First Dr's. Letter*")

137.    *First Dr's. Letter* included Plaintiff's diagnoses, severity of diagnoses, prognoses, medications, treatments, and compliance with treatment. *Id.*

138.    *First Dr's. Letter* found Plaintiff "safe and stable," he "denied any suicidal or homicidal ideation, intent, or plan," Plaintiff was "not a danger to others." Plaintiff was "deemed safe for outpatient care and there were no concerns for his safety." "Plaintiff's behavior has always been very appropriate and there were no concerns of any agitated or bizarre behavior." Plaintiff had a "good prognosis" and shows "a good response to treatment." Plaintiff had "no difficulty or concerns to perform his job as an economist." *Id.*

139.    June 2, 2020, Plaintiff submitted *First Dr's. Letter* to Mitchell.

140.    June 15, 2020, Mitchell stated FDIC's contractor Federal Occupational Health (FOH) wanted to speak with Dr. Warraich, and Plaintiff needed to sign a "FOH-AUD Authorization for Use or Disclosure of PHI.pdf." ("*Release*"). Exh. 18.

141.    Mitchell's instructions for completing *Release* would have allowed FOH to request **all** Plaintiff's VA medical records, unbounded in scope or time.

142.    June 18, 2020, Plaintiff replied "I'm hesitant to sign a blanket release to ask my doctor questions that I have not seen, and potentially by telephone where there will be no written record." Exh. 19.

143.    June 23, 2020, Mitchell provided questions he wanted FOH to ask Warraich: Exh. 20.

> (1) You [sic] letter mentioned that you would be meeting with Mr. Miller on May 27th for an appointment. Did the results of your May 27th appointment (or any appointments with Mr. Miller since) change the assessment you provided dated May 18, 2020 ? If so, how?

17

(2) Have you reviewed, and/or has Mr. Miller discussed with you his recent email interactions with FDIC leadership as shown in the attached email communications [attach email communications from Tabs 1, 3, 5, 6, & 7 of proposed suspension]? Does your review of these communications change the assessment you provided on May 18, 2020? If so, how?

144.    June 23, 2020, Plaintiff objected to the second question, alleging, "The FDIC is attempting to cause prejudice in her evaluation including raising the fear of racial and religious animus. Her evaluation would not have or consider the full context." Plaintiff said, "I'm willing to submit the evaluation notes she wrote for the May 27th telephone appointment. That will take time because I have to send a form to Release of Information requesting it." Exh. 21.

145.    June 15, 2020, Plaintiff filed *Complaint and Request for Preliminary Injunction* ("Complaint"); *Miller v. McWilliams; FDIC*, 1:20-cv-671 (EDVA), alleging retaliation for opposing discriminatory acts and practices (Cause of Action Two). Exh. 22.

146.    July 24, 2020, Plaintiff submitted his emergency motion for injunctive relief of Agency personnel actions. ("*Injunction*").

147.    August 4, 2020 at 1:14 p.m., EDVA denied *Injunction.*

148.    August 5, 2020 at 11:39 a.m., Mitchell indefinitely suspended Plaintiff without pay "until such time as the Agency has sufficient information to determine whether you pose a risk to yourself or others in the workplace." Exh. 23.

149.    In the twenty-two hours between denial of *Injunction* and *Decision*, Plaintiff had virtually no time to consider his options to comply with Mitchell's demands before the suspension.

150.    *Decision* accepted Plaintiff's explanation about seeking directions to Proven Arms and Outfitters and reading a news article about 'bump stocks.' Exh. 23, p. 2.

151.    Penalty in the *Decision* claimed to have "independently analyzed the relevant" *Douglas Factors*. It relied primarily on "the nature and seriousness of the offense," and next "the adequacy and effectiveness for alternative sanctions." *Decision* claimed to have considered mitigating factors such as "unusual job tensions, personality problems, mental impairment [and] provocation." *Id.*, p. 2.

152.    Plaintiff relented under financial pressure and asked Dr. Warraich to review the documents Mitchell requested.

153.    August 25, 2020, Appellant requested Mitchell narrow *Release* and to "Please give me exact guidance of what you need from my doctor to satisfy you that I am not unstable and do not pose a threat to myself or others." Exh. 24.

154.    August 27, 2020, Mitchell responded: Exh. 25.

> The only additional information I am seeking from Dr. Warraich would be answers to the following two inquiries that I identified for you back on June 24, 2020:[3]
>
> 1) Your letter mentioned that you would be meeting with Mr. Miller on May 27th for an appointment. Did the results of your May 27th appointment (or any appointments with Mr. Miller since then) change the assessment you provided dated May 18, 2020 ? If so, how?
>
> (2) Have you reviewed, and/or has Mr. Miller discussed with you, his recent email interactions with FDIC leadership as shown in the attached email communications. Does your review of these communications change the assessment you provided on May 18, 2020? If so, how?

155.    Plaintiff repeatedly requested an updated letter from Warraich after August 27, 2020, and he signed the *Release*.

---

[3] Actually, June 23, 2020.

156.    Warraich issued *Second Dr's. Letter* to Plaintiff on April 8, 2021 immediately after an appointment. Exh. 26.

157.    Warraich's professional opinion, after reviewing Plaintiff's communications, was unchanged.

158.    *Second Dr's. Letter* provided Mitchell everything he requested on April 10 and June 23, 2020, and August 27, 2021.

159.    May 12, 2021, Defendants demanded Plaintiff undergo both a psychiatric and physical examination by FOH. Exh. 27.

**Facts Relating to Damages.**

160.    Plaintiff remains on indefinite suspension without pay, retirement plan contributions, and other benefits since August 5, 2020.

161.    Defendants' unlawful actions caused Plaintiff to have highly irregular sleeping patterns, to sink into a deeper level of depression, and worsening of Plaintiff's service-connected disabilities including pain from spinal stenosis and pelvic floor pain, both necessitating physical therapy.

162.    Defendants' unlawful actions caused Plaintiff and his wife to postpone having a child out of fear of Plaintiff being fired and for loss of income.

163.    Defendants' unlawful actions caused Plaintiff and his wife severe anxiety about foreclosure, bankruptcy, and default on loans.

164.    Defendants' unlawful actions caused great tension between Plaintiff and his wife from the stress, resulting in arguments over time spent together, starting a family, and financial woes.

165.    Defendants' unlawful actions caused Plaintiff loss of enjoyment in life, lack of enthusiasm for exercise and recreation, lapses in household responsibilities, and isolation from family.

166.    Defendants acted with the intention to or effect of driving Plaintiff into foreclosure, bankruptcy, and default so it could fire Plaintiff for defalcation of just debts or for causing a loss to an insured financial institution under 12 C.F.R. §336.5(a)(3)-(4) and 12 C.F.R. § 336.8.

## Proceedings before the MSPB and AJ abuses of discretion and other errors.

167.    June 19, 2020, Appellant exhausted administrative remedies with OSC.

168.    July 3, 2020, Plaintiff timely filed his IRA appeal in the instant case.

169.    August 7, 2020, Plaintiff timely appealed indefinite suspension under 5 U.S.C. §75.

170.    After Plaintiff's EDVA Title VII retaliation claim was dismissed by stipulation, AJ granted Plaintiff leave to amend his appeal to include this claim as an affirmative defense.

171.    AJ abused discretion denying Plaintiff's motion for her withdrawal, relying on inapposite precedent and not considering extrajudicial factors for recusal and case-specific facts.

172.    AJ abused discretion refusing to certify her decision for withdrawal for interlocutory review.

173.    AJ abused discretion denying Plaintiff's motion to depose non-party Munsell St. Clair who had knowledge of a person who tried to affect Plaintiff's nonselection in 2014.

174.    Upon information and belief, Woolford-Eley is the person who influenced Plaintiff's nonselection in the 2014 nonselection.

175.    AJ abused discretion denying Plaintiff's motion to depose his former manager, Richard Brown, who had relevant and material information concerning whistleblower disclosures and Defendants' defense that he promoted Plaintiff in 2015 and 2016.[4]

_____

[4] Richard Brown is now deceased.

176.   AJ abused discretion denying Plaintiff's motion to disqualify Agency Counsel Norman who took part in personnel actions against Plaintiff, made false signings in the appeal, and wrongfully cloaked management discussions with attorney privilege.

177.   AJ abused discretion denying Plaintiff's motion to compel in its entirety, ignoring Federal Rules of Evidence and well-established law, and ignoring facts and argument raising the crime-fraud exception.

178.   AJ abused discretion denying Plaintiff's motion to depose McWilliams, Podsiadly, Rosenblum, Lerner, and Norman all of whom had personal knowledge of Plaintiff's disclosures and management discussions regarding those disclosures.

179.   AJ abused discretion denying Plaintiff's motion to depose Division Director Diane Ellis who made false statements, in violation of 18 U.S.C. §1001, with information she obtained from Shively, proving his retaliatory motives.

180.   AJ abused discretion denying hearing testimony from McWilliams, Svevar, and Sarisky, all of whom were alleged wrongdoers with knowledge of Plaintiff's disclosures.

181.   AJ abused discretion denying Exhibits RR-TT in hearing supporting Appellant's contentions his words and actions, upon which Defendants based their charge, were lawful, sane, and non-threatening.

182.   AJ held hearings on April 22, 2021 and April 26, 2021.

183.   Evidence and hearing for damages was bifurcated until after a decision, if necessary.

184.   AJ issued her initial decision (ID) on September 30, 2021, five months after the hearing, holding in Defendants' favor in the IRA appeal, Chapter 75 appeal, and Plaintiff's affirmative defense of discrimination. The decision became final on November 4, 2021. Exhibit 28.

185.   AJ ordered Defendants to return Plaintiff to work with back pay as of April 8, 2021 – the date Plaintiff submitted *Second Dr's Letter*.

186.   ID relied on numerous erroneous facts.

187.   ID relied on Plaintiff seeking directions to a gun store and reading a news article about a legal case involving guns even though Defendants accepted Plaintiff's explanations.

188.   ID did not contain any analysis of Defendants' motives to retaliate.

189.   ID did not consider all factors of credibility determinations.

190.   ID did not rely on substantial evidence.

191.   ID contained no analysis of the strength of Defendants' evidence in support of their actions.

192.   ID did not contain any analysis of the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision.

193.   ID did not rely on substantial evidence Defendants took similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

194.   AJ abused discretion by not finding Plaintiff was disabled, and Defendants committed disability discrimination by using his disabilities as reasons for personnel actions.

195.   AJ abused discretion finding Plaintiff did not make protected whistleblower disclosures.

196.   AJ abused discretion finding Plaintiff's disclosures were not specific and detailed.

197.   AJ abused discretion by not finding Plaintiff satisfied Defendants' requests for medical information on June 2, 2020.

198.   AJ abused discretion concluding, "there is no evidence to demonstrate that the agency had taken any actions against him" subsequent to prior protected disclosures.

199.   AJ acted as advocate for Defendants by conducting legal research into a prior whistleblower retaliation appeal Plaintiff filed, when Defendants had waived such arguments.

23

200.    AJ abused discretion finding no harmful errors and not considering all the harmful errors alleged in Plaintiff's pre-hearing submissions.

201.    AJ abused discretion considering only the evidence supporting Defendants' actions and ignoring evidence fairly detracting from it.

202.    AJ's lengthy series of severe and irrational errors favoring Defendants demonstrates deep-seated favoritism or antagonism as would make fair judgment impossible.

203.    Agency Petitioned for Review to the MSPB on November 4, 2021 opposing AJ's order to restore Plaintiff to work. The MSPB has not had a quorum for several years, and it might not have a quorum for a very long time before reaching a decision on Defendants' PFR.

## CLAIM ONE
### <u>Discrimination and Retaliation in violation of Title VII and ADA</u>
### Defendant McWilliams

204.    Plaintiff realleges all facts and incorporates herein by reference paragraphs 13 to 166.

205.    Plaintiff exhausted his administrative remedies.

206.    Plaintiff is a member of protected classes by race, sex, disability, and prior EEO activities.

207.    Defendant took personnel actions against Plaintiff because of his membership in these protected classes, including prolonged administrative leave, directing a psychiatric examination, threats of disciplinary action, proposing indefinite suspension, and indefinite suspension.

208.    Persons with discriminatory and retaliatory animus took or advised these personnel actions.

209.    Defendant's stated reasons for her actions are pretextual and were used as cover for prohibited discrimination and retaliation.

210.    Defendant's reliance as a basis for personnel actions on Plaintiff seeing a doctor and receiving treatment for disabilities caused by Defendant is discrimination and retaliation on the basis of disabilities.

211.    Defendant's reliance as a basis for personnel actions on Plaintiff's reports of discrimination and retaliation is retaliation on the basis of protected EEO complaints.

212.    Defendant conspired to rely solely on information and speculation supporting her pretextual reasons, and she systematically avoided or ignored evidence fairly detracting from her conclusions.

213.    Defendant's retaliatory actions would have the effect of dissuading a reasonable person from making further allegations of discrimination, retaliation, or opposing discriminatory acts and practices.

214.    Defendant's discriminatory and retaliatory actions caused Plaintiff and his wife to suffer severe emotional, physical, psychological, and financial harm.

## CLAIM TWO
### Retaliation for Opposing Discriminatory Acts and Practices under 42 U.S.C. §12203
### Defendant McWilliams

215.    Plaintiff realleges all facts and incorporates herein by reference paragraphs 13 to 166.

216.    Plaintiff exhausted his administrative remedies.

217.    *Disclosures* alleged Defendant conducts unthorough EEO investigations to avoid finding herself liable.

218.    *Disclosures* alleged Defendant virtually never finds herself liable for discrimination or retaliation in Final Agency Decisions without a decision of liability from an EEOC administrative judge.

219.    *Disclosures* included statistical evidence of disproportionate representation of wrongdoing by women and minorities against Plaintiff, a white male.

220.    Plaintiff's belief in the truth of those allegations was supported by evidence and were reasonable under the circumstances.

25

221.    Defendant attempted to prejudice a psychiatric examination by choosing three doctors who were all women and minorities.

222.    In response to Plaintiff's objection to this discriminatory act and practice, Defendant accused Plaintiff of discriminatory animus, threatened, and took personnel actions.

223.    Defendant attempted to prejudice Plaintiff's own doctor – a minority female – by demanding she see Plaintiff's protected disclosures of wrongdoing by women and minorities, which were irrelevant to her evaluation.

224.    Plaintiff objected to Defendant's attempts to prejudice his doctor, and Defendant continued to threaten and take personnel actions until Plaintiff allowed this.

225.    Defendant retaliated against Plaintiff based on an email he sent himself containing evidence for EEO discrimination and retaliation claims.

226.    Defendant's reliance on Plaintiff's opposition to discriminatory acts and practices to take personnel actions was unlawful retaliation.

227.    Defendant's retaliatory actions would have the effect of dissuading a reasonable person from making further allegations of discrimination, retaliation, or opposing discriminatory acts and practices.

228.    Defendant's discriminatory and retaliatory actions caused Plaintiff and his wife to suffer severe emotional, physical, psychological, and financial harm.

**CLAIM THREE**
**Retaliation in Violation of the Whistleblower Protection Act, as Amended**
**Defendant FDIC**

229.    Plaintiff realleges all facts and incorporates herein by reference paragraphs 13 to 203.

230.    Plaintiff exhausted his administrative remedies.

231.    Plaintiff made protected whistleblower disclosures of abuses of authority, felony crimes, false attorney signings, other violations of F.R.C.P., misprision of felonies, suborning perjury, obstruction of justice, conspiracy to commit crimes, and Constitutional torts.

232.    Defendant took unlawful personnel actions against Plaintiff described in 5 U.S.C. §2302(a)(2) because of these protected whistleblower disclosures, including: a significant change in duties, offering a psychiatric examination under threat of disciplinary action, threatening personnel actions, proposing indefinite suspension, and indefinite suspension.

233.    Plaintiff demonstrated Defendant's evidence for personnel actions was false, insubstantial, speculative, contrived, frivolous, and self-serving to avoid investigating Plaintiff's whistleblower disclosures and to retaliate against him.

234.    Plaintiff provided legitimate, non-threatening reasons for all his statements and actions.

235.    Defendant's whistleblower retaliation and adverse action caused Plaintiff and his wife to suffer severe emotional, physical, psychological, and financial harm.

236.    Defendant acted with the intention of driving Plaintiff into foreclosure, bankruptcy, and default so it could fire Plaintiff under 12 C.F.R. §336.5(a)(3)-(4) and 12 C.F.R. § 336.8.

## CLAIM FOUR
### Hostile Work Environment in violation of Title VII and ADA
### Defendant McWilliams

237.    Plaintiff realleges all facts and incorporates herein by reference paragraphs 13 to 166.

238.    Defendant conspired from 2011 to the present to create a hostile work environment for Plaintiff by putting him in constant fear of discrimination and retaliation on the basis of his race, sex, disabilities, and for making prior EEO complaints.

239.    Immediately after Plaintiff made disclosures of unlawful actions and opposing discriminatory acts and practices, and one month prior to the "alarming" email purportedly setting

off the chain of personnel actions, Defendant began searching Plaintiff's internet activity for evidence of wrongdoing for disciplinary action.

240.    Plaintiff reasonably fears that when he returns to duty, Defendant will keep him under constant surveillance and create pretextual reasons to discipline him.

241.    Plaintiff and his wife postponed having a child for more than ten years because of the constant fear Plaintiff would be fired or forced out of his employment.

242.    Defendant's hostile work environment causes Plaintiff to suffer severe emotional, physical, psychological, and financial harm.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff requests that the court grant him the following relief:

243.    Reverse the decision of the MSPB and order Defendants to return Plaintiff to the status quo ante as of November 13, 2019.

244.    Award Plaintiff compensatory damages that would make him whole for all earnings and benefits he would have received but for Defendant's discriminatory and retaliatory actions, including but not limited to, wages, pension, retirement fund contributions, and other benefits.

245.    Award Plaintiff compensatory damages for financial hardship, stress exacerbating his disabilities and creating new medical conditions, and mental anguish.

246.    Award Plaintiff special compensatory damages.

247.    Order Defendants to cease and desist from all future discrimination, retaliation, and other unlawful acts against Plaintiff.

248.    Order Defendants to cease and desist from all future monitoring, surveillance, searches, and other actions against Plaintiff to serve as a basis for disciplinary action for the remainder of his employment, absent an order from this Court.

249.    Order impartial investigators to investigate all of Plaintiff's whistleblower disclosures from 2011 to the present at Defendants' expense, and submit a comprehensive report to Plaintiff and this Court.

250.    Order OSC to investigate for potential disciplinary action for whistleblower reprisal: Jelena McWilliams, Nicholas Podsiadly, Brandon Milhorn, Jeff Rosenblum, Andrea Woolford-Eley, Patrick Mitchell, Philip Shively, Ryan Singer, Eric Gold, Thomas Sarisky, Christine Svevar, Adam Bovenzi, Daryl John (D.J.) Miller, and any other person who participated in, advised, or assisted in the discriminatory or retaliatory personnel actions.

251.    Refer for criminal investigation the conspiracy between Aaron Wade Norman, Patrick Mitchell, and agency counsel Pamela Nelson to have Mitchell present false facts, in violation of 18 U.S.C. §1001, alleging Mitchell "reminded" Plaintiff on April 10, 2020 that Philip Shively's January 24, 2020 letter gave Plaintiff the option to see his own doctor "rather than" an agency-designated doctor.

252.    Impose sanctions on Aaron Wade Norman for false signings and other F.R.C.P. violations during the MSPB proceedings.

253.    Award Plaintiff front pay in the amount of Plaintiff's salary and retirement fund contributions (matched and unmatched), adjusted annually for inflation and bonuses to the same extent as comparable employees, including locality pay where Plaintiff chooses to live or in Washington, D.C., whichever is greater, until Plaintiff reaches the age of full social security benefits, and Defendant crediting such years of employment as if Plaintiff were employed by the federal government.

254.    Order Defendant to restore Plaintiff's full access to FDIC facilities and Defendants' intranet including his @fdic.gov Outlook email account.

255.    Award Plaintiff's costs and expenses of this action, including reasonable attorneys' fees (if

any), in accordance with 42 U.S.C. §1988.

256.    Other damages and further relief as deemed just.

## JURY TRIAL WAIVED

Plaintiff requests a decision for all claims by an Article III judge, except as not permitted

by law.

EXECUTED DECEMBER 3, 2021

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## **RULE 11 CERTIFICATIONS**

Under Fed.R.Civ.P. 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of F.R.C.P. 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in dismissal of my case.

I declare under penalty of perjury that no attorney has prepared or assisted in the preparation of this document.

Executed on December 3, 2021.

Robert M. Miller, Ph.D.
Pro Se
4094 Majestic Lane
#278
Fairfax, VA  22033
RobMiller44@hotmail.com

## <u>CERTIFICATE OF VERIFICATION</u>

I, Robert M. Miller, declare as follows:

1.   I am Plaintiff in the above-captioned, a citizen of the United States of America and the Commonwealth of Virginia.

2.   I have personal knowledge of all the facts in this case, except as otherwise specified or as permitted to plead generally under Fed.R.Civ.P. 9(b), and if called upon to testify, I would competently testify as to the matters stated herein.

3.   I verify under penalty of perjury under the laws of the United States of America that the foregoing factual statements in this **Verified Complaint and Petition for Review** are true and correct. 28 U.S.C. §1746.

EXECUTED in the City of Washington, District of Columbia, on this Third Day of December, in the Two-Thousand and Twenty-First Year of Our Lord.

Robert M. Miller, Ph.D.
*Pro Se*
4094 Majestic Lane, #278
Fairfax, VA  22033
RobMiller44@hotmail.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 3, 2020 a copy of the foregoing

VERIFIED COMPLAINT AND PETITION FOR REVIEW was filed in person to the Court.

I caused a copy of this filing to be served by certified U.S. Mail to:

Nicholas Podsiadly, General Counsel
Federal Deposit Insurance Corporation
550 17th Street, NW
Washington, D.C. 20429


U.S. Attorney for the District of Columbia
501 Third Street, NW
Washington, DC 20001

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC  20530-0001


/s/ Robert M. Miller

Pro Se